Inland Lime and Stone Company v. Commissioner.
Inland Lime & Stone Co. v. Commissioner
Docket No. 219.
United States Tax Court
1945 Tax Ct. Memo LEXIS 280; 4 T.C.M. (CCH) 283; T.C.M. (RIA) 45087; March 2, 1945
*280 Harry Thom, Esq., 231 S. La Salle St., Chicago, Ill., for the petitioner. Harold H. Hart, Esq. for the respondent. STERNHAGEN The Commissioner determined deficiencies of $5,317.08 income tax for 1938, and $8,668.24 income tax and $1,777.50 declared value excess-profits tax for 1939. He disallowed a business expense deduction taken in each year for alleged "royalties"; and, in the alternative, the taxpayer contends that such "royalties" should be treated as capital expenditures as the basis of additional depletion deductions. Findings of Fact The petitioner, a Michigan corporation, engaged in the business of quarrying and selling limestone, filed its income tax returns in Detroit. Its books and returns were on an accrual basis. Inland Steel Company, hereinafter called Steel, is a Delaware corporation, with its office at Chicago, Illinois. During 1938 and 1939, Steel owned all of the outstanding capital stock of petitioner. Manistique Lime & Stone Company (hereinafter called Manistique), a Michigan corporation with its office in Manistique and engaged in the quarrying and sale of limestone, had on November 1, 1927, 2,479-47/48 shares outstanding. On that date *281 George J. Nicholson owned 264 1/2 of such shares and represented that he had the right to vote 1,635 additional shares and to acquire other shares. An agreement in writing, dated November 1, 1927, was made between Manistique and Nicholson as first parties and Steel as second party, in which Manistique and Nicholson agreed to transfer to a new corporation to be formed [petitioner] all the lands and interest in lands of Manistique and Nicholson, - approximately 2,147 acres, - together with all the assets and liabilities of Manistique. Manistique was then to be dissolved. Under subsection (a), one-half of the shares of petitioner were to be issued to Manistique for distribution to its shareholders and one-half to Steel. Nicholson was to designate three of the six directors of petitioner and Steel the other three. Under subsection (b), Steel was to advance $125,000 to petitioner for payment of the liabilities of Manistique, and, under subsection (c), was to advance an additional amount, not to exceed $1,500,000, for the construction of a new crushing plant, etc., required to produce annually, during the season of navigation, 500,000 tons of stone for the steel industry and 500,000 *282 tons for other outlets. The sums so advanced were to be repaid to Steel by petitioner out of its first earnings. Under subsection (e), Steel was to purchase and petitioner to sell Steel's entire requirement of crushed limestone. Steel had until noon of December 31, 1928, to accept the agreement. After this agreement Steel made exploration of the lands to test the quality and depth of the deposit. After tests it was concluded that the stone was desirable. Nicholson was found to be not suitable in the administration of the new project and Steel would therefore not exercise its option or make the advance as required by the agreement of November 1, 1927. It was suggested to Nicholson that he furnish half of such funds. Steel then agreed to advance the money and receive 51 per cent of the shares of petitioner to assure Steel of control. A supplemental agreement dated October 19, 1928, was made in which Steel accepted the agreement of November 1, 1927, as modified. New provisions were substituted for subsections (a), (c) and (e) of the proposal contained in the original agreement. All other provisions were ratified. By new subsection (a) a new corporation [petitioner] was to be organized *283 to which all the lands and interests of Nicholson and Manistique were to be transferred, the new corporation to issue 49 per cent of its shares to Manistique, to be distributed to its shareholders, and 51 per cent to Steel. By new subsection (c) Steel was to advance such sums as would be required for the described construction to produce annually during the season of navigation one million tons of stone, and repayment to be made to Steel out of the first earnings of petitioner. New subsection (e) provided: "The Steel Company shall purchase and the new corporation shall sell and deliver FOB vessels at loading dock at cost plus ten per cent (10%) the Steel Company's entire requirements of crushed limestone for use in its blast furnaces and open hearth furnaces, for all such furnaces now owned by said Steel Company, and for all such furnaces which shall hereafter be owned by said Steel Company on Lake Michigan, this obligation to bind the successors in interest to said Steel Company only as to such furnaces as are now owned by said Steel Company and as to such as it may hereafter build as additions to its present plant. Cost shall include the average labor and supply cost of all stone *284 quarried from the new quarry which it is planned will be developed, the cost of transporting, crushing, screening and otherwise preparing said stone for the Inland Company, the loading cost, and all other direct costs properly chargeable to said stone for the Inland Company, and shall also include its pro rata share of interest, depreciation and depletion charges and a proper pro rata of the general overhead expense of the Company, it being the intention that the costs of the lime end of the business will be kept separate and that stone sold to the Inland Company will bear only its proper share of those costs having to do with the production of stone for the steel industry." The supplemental agreement further provided that if the employment of Nicholson by petitioner was terminated, 25 per cent of its shares were to be tendered by him to Steel for $100,000 cash forthwith, and $92,000 (less such dividends as had been paid for the account of Nicholson as provided in the original agreement), payable $5,000 a year, and "There shall also be paid by said [Inland] Steel Company to said George J. Nicholson, his heirs, personal representatives or assigns, the sum of One Cent ($.01) royalty *285 per gross ton of stone produced to be determined by vessel weights as to such stone as is shipped by water, by railroad weights as to such crude stone as is shipped by rail, and by weighing prior to manufacturing as to such stone as is subjected to a manufacturing process. Suitable endorsement shall be made on stock certificates isued to said Nicholson giving notice to all subsequent transferees of the provisions herein contained." The petitioner was incorporated on December 11, 1928, and immediately thereafter acquired all of the assets of Manistique; 49 per cent of its 100,000 shares was issued to Manistique for distribution to its shareholders and 51 per cent to Steel. At the first meeting of petitioner's shareholders December 14, 1928, the agreement of November 1, 1927, and the supplemental of October 19, 1928, were, pursuant to the contract of November 1, 1927, ratified and approved. At the first meeting of petitioner's directors December 14, 1928, the president and secretary were authorized to accept the transfer of all Manistique assets and to execute the agreements of November 1, 1927, and October 19, 1928. Manistique and Nicholson immediately after the formation of petitioner *286 conveyed and transferred the limestone lands to petitioner. Nicholson also transferred the options for the purchase of lands which he had obtained for petitioner, the expense of which was to be a capital charge to petitioner. It took about two years to open the quarry, build the railroad, construct a crushing plant, build a breakwater and develop the harbor. The first shipment of stone was made in October, 1930. Steel's investment of more than three million dollars was thought to be in serious jeopardy if Nicholson should continue in any executive direction of the affairs of petitioner. Early in 1931, Nicholson notified petitioner that he would resign and tendered to Steel 25 per cent of petitioner's shares. Thereupon, negotiations were had with Nicholson to end his participation in the affairs of petitioner by the purchase of all of the minority shares, culminating in an agreement dated March 5, 1931, by and between Steel and Nicholson and other minority shareholders in which the latter agreed to sell to Steel 49,000 shares, being all the shares which had been transferred to Manistique; and Steel, to carry out its obligations under the agreements of November 1, 1927, and October 19, 1928, and *287 in further consideration of the transfer to it of an additional 24,000 shares, agreed to pay to Nicholson and other owners of the 49,000 shares "a total royalty of Two Cents (2!) per gross ton of 2240 pounds on any and all grades or qualities of merchantable stone produced and shipped by" petitioner from lands then owned by it, and $100,000 cash. On March 5, 1931, Nicholson transferred 25,000 shares and he and other owners transferred 24,000 shares to Steel, and Steel paid the $100,000 to the persons designated in the agreement of March 5, 1931. On March 11, 1931, Steel paid to Nicholson's father $54,790.95, being the agreed commuted value of the $92,000 payable under the contract of October 19, 1928. The amounts of $100,000 and $54,790.95 were charged by Steel to an account designated "Inland Lime and Stone Company - Stock Account". In 1931, petitioner commenced quarrying and manufacturing operations on the property described in the agreement of March 5, 1931. The tons of limestone quarried and shipped by petitioner and the amounts called "royalties" paid by Steel are as follows: Tons
Payments
1931
748,769
$14,975.37
1932
244,095
4,881.90
1933
867,526
17,350.52
1934
941,186
18,823.72
1935
1,517,034
30,340.68
1936
2,124,569
42,491.38
1937
2,259,120
45,182.40
1938
1,398,041
27,960.82
1939
2,375,589
47,511.78
*288 The above amounts were charged by Steel to an account designated "Royalty on Limestone", which was a running account with an accumulating balance. The corresponding credits were made to "Cash Disbursements" account. On August 31, 1938, Steel issued a debit memorandum to petitioner stating that petitioner's account had been charged with $6,095.72 "Royalty on stone paid for your account accrued from Jan. 1 to June 30, 1938". This amount was paid by Steel to persons named in the contract of March 5, 1931, for stone quarried and shipped by petitioner from January 1, 1938, to June 30, 1938. Petitioner made an entry on its books charging $6,095.72 to "Profit and Loss" and crediting "Royalty Account Accrued". This was the first entry ever made by petitioner pertaining to "royalties" payable by Steel under the agreements of October 19, 1928, and March 5, 1931. On August 31, 1938, petitioner made a similar entry charging profit and loss and crediting royalty account accrued with $6,921.82, which amount is the payment made by Steel for stone quarried and shipped by petitioner for July and August, 1938. Monthly thereafter during 1938 petitioner made similar entries of amounts of two cents *289 a ton paid by Steel under the contract of March 5, 1931, for stone quarried and shipped during each of the remaining months of 1938. The total amount accrued in 1938 was $27,960.82. For 1939, similar entries were made in petitioner's books charging to profit and loss and crediting to royalty account accrued as follows: June 30
$12,762.90
July 31
5,734.86
August 31
6,022.42
September 30
7,005.58
October 31
8,083.26
November 30
7,463.28
December 31
439.48
$47,511.78
Payments were made by petitioner to Steel for the so-called "royalties" paid by Steel for 1938 and 1939, under the agreements of October 19, 1928, and March 5, 1931, as follows: September 6, 1938
$ 6,095.72
October 24, 1938
11,687.48
February 4, 1939
10,177.62
July 12, 1939
12,762.90
October 28, 1939
18,762.36
February 6, 1940
15,986.02
Such payments were charged on petitioner's books to "royalty account-accrued" and credited to cash disbursements. On Steel's books they were charged to cash receipts and credited to "royalty" on Limestone account. No part of the "royalties" has ever been capitalized by petitioner and added to the basis of its limestone lands *290 and no depletion allowance has ever been made or taken on such payments. In its 1938 and 1939 income tax returns petitioner deducted as "royalties" $27,960.82 and $47,511.78, which deductions were disallowed by the Commissioner. Steel took no deduction in its 1938 and 1939 income tax returns for the payments of $27,960.82 and $47,511.78 nor has the Commissioner allowed such deductions to it. Memorandum Opinion STERNHAGEN, Judge: The taxpayer demands a deduction of $27,960.82 for 1938 and $47,511.78 for 1939, which it calls "royalties" said to have been paid for limestone. It argues that the three contracts set forth in the findings are to be regarded as a single integrated contract, and that under such an integrated contract it is to be regarded as paying the above amounts as royalties for the limestone quarried from the lands acquired from Nicholson and Manistique in 1928. There is no occasion to consider whether the three contracts are to be treated as one, for even so, that would not serve as a ground for the taxpayer's proposition. As the evidence shows, the land and its limestone content were acquired by taxpayer for its share which were issued to Manistique for distribution *291 to its shareholders, - Nicholson and others. Steel was to acquire the limestone from taxpayer when quarried, and for it was to pay a prescribed amount to taxpayer. It was to pay the former owners for their shares in taxpayer amounts, called "royalties", measured by the tons of stone produced. Whatever by this arrangement Steel paid to Nicholson and other former owners of taxpayer's shares, who had been owners of Manistique shares or limestone properties, was payment for their shares of taxpayer's stock. The payments to these individuals were not in payment for the land or the limestone which they had formerly owned either by way of royalties or anything else. The land had already been completely acquired by taxpayer for its shares. The three contracts of 1927, 1928 and 1931, were considered by this court in Nicholson's case (), and it was decided that the amounts were received by Nicholson from Steel, not as royalties but as parts of the sale price of his shares. Nothing in the record or argument of the present case leads to any different conception of the clearacter of the payments. As shown plainly by the evidence here, the taxpayer did not pay for the limestone *292 or contract to do so by any royalty method. It bought the tracts of land outright and paid for them with its shares. Thereafter it owned the lands. Any payments to the former owners of the lands, even though measured by the stone extracted, were not royalties ( . Furthermore, the payment per ton for the stone produced was a contractual obligation of the Steel corporation; and if such payments could be characterized arguendo as royalties, they were clearly not the subject of deduction as such by this taxpayer, who neither paid nor owed them. The Commissioner's determination is sustained. The taxpayer presents an alternative contention that it is entitled to additional deductions as depletion of the limestone quarries based on the so-called "royalties". The contention is thus stated in its brief: In the alternative, if the respondent claims that the royalties paid are capital expenditures, the petitioner is entitled to a deduction for depletion thereon. This is followed by a computation of the claimed depletion deduction based upon the tonnage and the so-called royalties alleged to have been paid in each of *293 the two taxable years. To this it might be answered that since the respondent does not claim "that the royalties paid are capital expenditures" of this taxpayer, the condition of the alternative claim is absent and the claim is not pressed. But the respondent's position is that the amounts of the so-called royalties are in fact amounts paid by the Steel corporation under the contracts, and cannot be regarded as payments made by the taxpayer and are not therefore the measure of its depletion; that depletion has been allowed to taxpayer each year since 1931 measured by the wasting of its quarries, and this is not properly to be enlarged in the taxable years by the accounting adopted in such years by the two corporations in respect of the amounts paid by the Steel corporation and debited to the taxpayer. As appears from the findings, there is no basis for a change in the taxpayer's depletion deductions already allowed by the Commissioner, for the amounts paid by the Steel corporation measured by the tons of limestone delivered to it by taxpayer are not to any extent the measure of the taxpayer's investment in its depletable asset. The alternative claim for deduction is therefore not *294 supported by the evidence. Decision will be entered under Rule 50.